**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00115-CR**
_____

**BRADLEY ROBERT KONNING, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 21-37450**

_____

**MEMORANDUM OPINION**

A grand jury indicted Appellant Bradley Robert Konning ("Konning" or "Appellant") for the murder of Lizeth Carpio. Konning pleaded guilty, and Konning elected to have the jury decide punishment. The trial court submitted the punishment to the jury and asked the jury to decide whether Konning proved he caused Carpio's

1

death under the immediate influence of sudden passion.[1] The jury found Konning

failed to prove he acted under the influence of sudden passion, and the jury assessed

---

[1] The defendant does not challenge any part of the Jury Charge. In the charge the trial court submitted to the Jury it included the following excerpts pertaining to "sudden passion":

**SPECIFIC LAW APPLICABLE TO THIS CASE**
The Defendant has pleaded guilty to the offense of Murder as charged in the indictment. It is now your duty to assess punishment. The defendant contends he committed the murder under the immediate influence of sudden passion arising from an adequate cause. Before you assess punishment, you must determine whether the defendant has proved this contention.
**Relevant Statutes**
A defendant convicted of murder may raise the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. This is called the doctrine of "sudden passion."
. . .
**Burden of Proof**
The burden is on the defendant to prove, by a preponderance of the evidence, that he acted under the influence of sudden passion.
**Definitions**
"Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation.
"Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.
The term "preponderance of the evidence" means the greater weight and degree of the credible evidence.
. . .
**Application of Law to Facts**
You must determine whether the defendant has proved, by a preponderance of the evidence, that he acted under the immediate influence of sudden passion arising from an adequate cause.

2

punishment at seventy-three years of confinement. In five issues, Konning challenges the legal and factual sufficiency of the evidence to support the jury's finding on sudden passion. We affirm.

---

You must all agree on whether the defendant has proved sudden passion before you may assess punishment.

Your resolution of this issue will determine which of the two verdict forms you will use.

If you all agree the defendant has proved sudden passion, use the first verdict form, titled "Verdict-Defendant Has Proved Sudden Passion." If you all agree the defendant has not proved sudden passion, use the second verdict form, titled "Verdict-Defendant Has Not Proved Sudden Passion."

If you all agree the defendant has proved, by a preponderance of the evidence, that he acted under the influence of sudden passion, you are to determine and state in your verdict-

1. a term of imprisonment for no less than two years and no more than twenty years, or

2. a term of imprisonment for no less than two years and no more than twenty years and a fine of no more than $10,000.

If you all agree the defendant has not proved, by a preponderance of the evidence, that he acted under the influence of sudden passion, you are to determine and state in your verdict-

1. a term of imprisonment for no less than five years and no more than ninety-nine years or for life, or

2. a term of imprisonment for no less than five years and no more than ninety-nine years or for life and a fine of no more than $10,000.

. . .

There were two jury verdict forms given to the Jury and the Jury filled out and signed the second verdict form, titled "Verdict-Defendant Has Not Proved Sudden Passion."

Evidence Submitted to the Jury

Law Enforcement Testimony About the Incident

Kory Gerber, a patrol officer for the Beaumont Police Department, testified that he was dispatched to a home on McFaddin Avenue about 10:27 a.m. on April 29, 2021, for a complaint from "Candy."[2] Upon arrival, he saw an unoccupied truck that was parked but running and a woman with blood on her face lying on the ground, and she appeared to be deceased. Gerber testified that he noticed flowers lying on the ground and a handgun beside the woman. According to Gerber, the police became aware of a possible suspect, and they went looking for Konning, and Gerber also spoke with Konning's sister "Alva."

Brandy Dyson, a crime scene technician with the Beaumont Police Department, testified that she took photographs at the scene on April 29, 2021. She identified State's Exhibits 10 through 76 as photographs of the scene, and she agreed that some of the photographs depict a camera mounted on a second-story window at the home. Dyson agreed there was a truck at the home with water or condensation underneath it, and she took a photograph to show that the truck had been running. Dyson also agreed that State's Exhibit 39 shows some legal papers on the front passenger's seat of the parked vehicle, Exhibit 40 was signed by Carpio and dated April 27, 2021, and Dyson stated the papers were what "looks like somebody's

_____

[2] We use pseudonyms to refer to witnesses not affiliated with law enforcement.

4

asking for a divorce." Dyson identified other exhibits as letterhead for the Crime Victim's Unit of Lone Star Legal Aid and other exhibits as a document handwritten by Carpio.

Dyson agreed that photos of Carpio show significant injuries to her face, depict a pistol next to her body, and it appears that Carpio has car keys in her hand. Dyson identified State's Exhibit 131 as a box containing a pistol, an empty clip, and a bag with bullets recovered from the McFaddin residence on April 29, 2021. Dyson also testified that a shell casing was found at the scene.

Yvette Borrero, a detective sergeant with the Family Violence Unit of the Beaumont Police Department, testified that she went to the home on McFaddin on April 29, 2021. She recalled that, upon arrival, she saw Carpio lying on the ground, flowers on the ground, a pistol lying next to Carpio, a pickup truck with the engine running, and a Chevy Malibu at the end of the driveway. She agreed there were papers of interest inside one vehicle, and the papers were admitted as State's Exhibit 6. According to Borrero, the police noticed cameras mounted on the house, and they obtained a download from the cameras from Carpio's phone. Borrero agreed that the video showed Konning holding flowers and that it also showed Konning rush over toward Carpio.

Borrero testified that she recognized Carpio's name from a pending case and based on that case and after talking with Konning's sister, the police spoke with

5

Konning. Borrero recalled that, when Carpio died there were two open domestic violence cases that involved Konning; in one, Konning was out on bond; in both cases Carpio was cooperating as a witness. According to Borrero, Konning had been told not to go to Carpio's home on McFaddin, and Borrero knew that Carpio had gone to the District Attorney's Office asking for a protective order.

Bruce Minter testified that he is the captain of technology and records for the Sheriff's Department, and he oversees electronic systems. He agreed he had been asked to download Konning's outgoing phone calls from April 3rd to October 13th of 2021 that were recorded by the system used at the Jefferson County jail. Minter identified State's Exhibit 128 as his "stick drive" containing the recordings of Konning's phone calls that Minter downloaded.

Dr. Selly Rivers, a private forensic pathologist who performs autopsies, testified that she performed an autopsy of Carpio. Rivers found two gunshot wounds on Carpio, one to the left side of her head and the other to her right cheek. According to Rivers, either of the two shots could have been enough to cause Carpio's death, and no treatment could have saved her. Rivers determined that the cause of Carpio's death was "a gunshot wound [to] [] the head, perforating the left jugular vein, left carotid artery, the left subclavian vein, the esophagus and cervical vertebral body." The doctor concluded that the means and manner of Carpio's death was homicide.

Testimony of Carpio's Friend

Carpio's best friend Candy testified that she had known Carpio for about three years, and they worked together at an auto parts store. Candy testified that she spoke with Carpio on April 29, 2021, to make sure she was okay because the previous night, Carpio had mentioned she was scared and had no electricity at her house. According to Candy, Carpio told her she felt harassed, threatened, and afraid for her life for about two weeks, and while Candy was on the phone with Carpio on April 29, Carpio told her to "call the cops, he's here." Candy testified that she called Carpio's mother to get the address for Carpio's home, and Candy then called 911.

Candy identified Carpio and Konning in the video that was admitted as State's Exhibit 8—a video about one-and-a-half minutes long—that was published to the jury. Candy testified that she went to the scene afterwards, and she was also asked by the police to give a statement. According to Candy, she went to work later that day, where she saw Konning at the store, but she did not know of any reason for Konning to be there, and she thought it was possible that Konning had heard Candy's voice earlier in the day when she was on the phone with Carpio.

Testimony from a Victims' Assistance Center Caseworker

Sheila Jolivet testified that she is a caseworker at the Victims' Assistance Center where she has worked with the District Attorney's Office. Jolivet testified that Lizeth Carpio contacted her office in April 2021 to try to get a protective order

against Konning for herself and her one-year-old daughter, and Carpio had also contacted the office in 2019 and 2020. Jolivet agreed that she helped Carpio with the required paperwork, including preparing an affidavit. Jolivet identified State's Exhibit 2 as a Protective Order Application with an information sheet. Jolivet identified State's Exhibit 5 as containing Carpio's own words that Jolivet typed out. According to Jolivet, Carpio asked her to include a statement that "[h]e continued calling my job making threats that he's going to kill me." Jolivet testified that there was no signature on the documents because Carpio had to leave and get a battery for her vehicle, which she was selling, but that Carpio had promised she would come back to sign the papers after the vehicle was sold.

Jolivet testified that while Carpio was applying for a protective order, she was receiving phone calls from Konning, and Carpio was "[u]pset, fearful, nervous, [and] crying." Jolivet agreed that the information Carpio wrote on her application included the following allegations about Konning: Konning was then on probation and he had been convicted of assault on a peace officer and child endangerment; there were pending charges against Konning for family assault; she and Konning had been separated for four months and she planned to divorce him; and Konning had pushed her, grabbed her hair, slapped her, punched her face, strangled her, threatened her with a weapon, hit her head against a wall or object, and used a car as a weapon. Carpio wrote on her application "[a]fter plenty [of] episodes, he escalated and told

8

me he wanted to kill me[.]" Carpio also wrote that on April 28, Konning called her at work and "said he was going to kill [her] and that he didn't care [about] going to jail because without [her] he [didn't] have anything." Carpio also wrote that on April 28, Konning turned her breakers off at her home, and on April 29, she woke up to see her tires had been slashed, she could not go anywhere without the fear of him killing her and her daughter, and she was not safe anywhere. Carpio indicated that Konning had a long-term pattern of threats and harassment, had threatened to kill her, and had said, "If I cannot have you, no one can[.]"

Testimony from Dispatcher and Officers About Prior Incidents

Shelby West testified that she works for 911 dispatch for the police department, and she received a call on August 22, 2020, about a "rolling disturbance" involving two vehicles. West identified State's Exhibit 161 as a thumb drive containing a recorded phone call to dispatch in which Lizeth Carpio reported that someone was "chasing and hitting her car." The exhibit was admitted and published to the jury. West testified that on several occasions, you could hear Carpio scream during the 911 call, and that Carpio told her during the 911 call that "he" was going to kill her.

Officer Jacob Froman with the Beaumont Police Department testified that on August 22, 2020, he responded to a report of a "rolling disturbance" or "road rage" where someone was running into another vehicle. Lizeth Carpio had called in the

incident, and she flagged the police down and pointed out the vehicle that was involved in the incident with her. Froman activated his overhead lights, but the other vehicle continued to drive, and Froman chased it. Once the vehicle stopped and Froman approached, he saw a male driver—whom Froman identified as Konning—and a child in the front passenger seat. Froman recalled that Konning was charged with evading with a motor vehicle, endangering a child, and aggravated assault with a deadly weapon. Froman identified Exhibit 160 as a thumb drive of a video from his vehicle and body camera that night, and the exhibit was admitted and published to the jury.

Officer Augustin Palomares with the Beaumont Police Department testified that he was working patrol on August 22, 2020, and he responded to a reported "rolling disturbance" with Officer Froman, both officers activated their lights, and Palomares activated his siren as they chased the suspect who "continued to evade" until the suspect stopped at a residence. Palomares testified that the driver he pursued was Konning, and there was a child sitting in the front seat of Konning's car. Palomares recalled that Carpio seemed in fear for her life that night. Recordings from Palomares's vehicle and body camera were admitted into evidence and published to the jury.

Roderick Williams, a patrol officer with the Beaumont Police Department, testified that on August 4, 2020, he was dispatched to a residence for a report of a

10

man "allegedly planning on breaking windows to a residence." Once on the scene, Williams saw Konning come from the back of the house to the front yard, and when Williams asked Konning to come toward him, Konning refused. When Konning tried to walk away, Williams grabbed him by the wrist and advised him he was being detained, and Williams pulled Konning to the ground to place handcuffs on Konning. Williams recalled that when Carpio arrived, she said, "[h]e's not supposed to be here." Williams testified that he called for backup, and when Officer Hanley arrived, Konning continued to resist, and Konning hit Hanley in the leg. Video from Williams's body camera that day was admitted and published to the jury.

Officer Stewart Hanley with the Beaumont Police Department testified that he was dispatched to the disturbance on August 4, 2020, and upon arrival Officer Williams was already on the scene. Hanley recalled that he saw Officer Williams "laying on the ground with the suspect wrapped up[,]" and while trying to assist Williams, Konning struck Hanley's leg. Hanley was treated for injuries. Video from Hanley's body camera was admitted and published to the jury.

Detective Amber McMichael with the Beaumont Police Department testified that she also responded to a call of an officer needing assistance on August 4, 2020. McMichael testified that when she arrived, the other officers had Konning in handcuffs. McMichael recalled that Carpio was at the scene, and she said that she and Konning were married, had a small child, and that Konning was upset because

11

she had filed for divorce that day. McMichael thought that Carpio appeared to be in fear for her own and her daughter's safety. Video from McMichael's body camera was admitted and published to the jury. McMichael agreed the recording depicts Konning saying he was "going to break all the windows out of the house until [Carpio] came to the house[.]" She also testified that Carpio told her she had changed the locks on the house the previous day so Konning could not get inside.

Testimony of Konning's Family Members

Konning's sister "Alva" testified that on the morning of the shooting she asked her brother (Konning) to go to the store and get some groceries. He drove her Chevy Malibu. He later came back and put the groceries on the cabinet and gave her the keys. Later that day, she learned that something had happened when she received calls from two detectives, and she learned that Carpio had been murdered and her brother had been arrested. Alva testified that she visited Konning in jail, and he admitted to shooting Carpio. Alva looked at a still photo from the video of the incident, and Alva agreed it depicted her brother and Carpio. Alva agreed she had listened to audio recordings of her telephone calls with Konning while he was in jail, and she did not appreciate that he tried to blame her and their mother for the crime.

Alva testified that Carpio called the police on Konning "a lot," sometimes for a good reason but sometimes not. Alva testified that she let Konning stay with her several times after Carpio kicked him out. She agreed there was "constant fighting[]"

12

between Konning and Carpio, Konning told her he went to Carpio's house that day to make peace with her, and Konning had admitted he shot Carpio. Alva also agreed that, at one point, there was a charge against Konning for assaulting Carpio, but Carpio had signed a non-prosecution affidavit.

Konning's mother "Sheila" testified that when Konning was about thirteen years old, he took her car without her permission, he hit some neighbors' cars, and he was placed on probation. She agreed that, while on probation, he got in trouble for assaulting a school janitor and another time, he was kicked out of school for assaulting a staff member. Sheila agreed that over the course of Konning's relationship with Carpio, Carpio "kicked him out of the house quite a bit[.]"

Konning's uncle "Donald" testified as a defense witness. He testified that the relationship between Konning and Carpio had ups and downs, they fought a lot, and some of the fights were violent. According to Donald, he knew Carpio had a gun, and Carpio had shown it to him.

Konning's Testimony

Konning testified that he met Carpio in April 2019 when he started working at an auto parts store where Carpio was a manager, and they started dating. Konning testified that the two started fighting verbally after a few months of living together. He admitted lying to Carpio about contacting another woman, and when Carpio got tired of him lying to her, she started throwing him out of the house. After Carpio

13

became pregnant, the two married in December 2020. The couple first lived on Pradice Street and later moved to McFaddin Avenue.

Konning testified that the fights became physical, Carpio pulled a gun on him once or twice, he did not call the police because Carpio was a felon, and he did not want her to get arrested for having a gun. He also testified that one time Carpio threatened him with a butcher knife. He testified that the fights were "[e]very other week or every other month[,]" and he would stay with his sister when Carpio kicked him out. He recalled that Carpio had called the police on him more times than he could count. Konning testified that, after he pleaded guilty to evading arrest and endangering a child from the August 2020 incident, Carpio bonded him out of jail even though there was a no-contact provision under his bond.

State's Exhibit 8—the video from Carpio's security camera the day of the shooting—was played in court, and Konning was questioned as to why he went to Carpio's house the day of the shooting. Konning testified that he went to her house that day with flowers so Carpio would see he was serious about loving her. He knew there was a protective order in place prohibiting him from contacting Carpio, and he testified that did not have a gun or knife, nor did he have any intent to harm Carpio. Konning added that when he got out of his car, he did not know that Carpio had a gun. But when he saw that she did, he thought: "She hates me. [] [S]he's gone for good. She'd rather me be dead." According to Konning, he panicked, he hurt "so

14

bad[,]" and he had passion in his head. He agreed that he hit Carpio, knocked her down, and that he killed her because he knew she hated him and that she wanted him dead. Konning stated he was sorry, and he wished he could "take back the eight seconds[]" between when he saw the gun until he shot her. Konning testified that when he shot Carpio, he was not in his right frame of mind nor thinking clearly, and his heart was broken. According to Konning, after the shooting, he went to his sister's house, dropped off her keys, and then went to his aunt and uncle's house. Konning agreed he that at some point, confessed to his sister.

On cross-examination, the following exchange occurred:

[Prosecutor]: . . . [Y]ou said you wanted -- your lawyer was asking about sudden passion. Is that what you're claiming you were suffering under?

[Konning]: No.

[Prosecutor]: All right. You weren't suffering under sudden passion?

[Konning]: I wasn't -- when I mentioned that, it wasn't about what I was suffering from.

[Prosecutor]: Okay. When you shot and killed Liz Carpio, were you operating under the condition of sudden passion?

[Konning]: Yes, sir.

[Prosecutor]: All right. Okay. And what sudden passion were you offering -- were you working under?

[Konning]: Do I have to answer that question?

The Court: You have to answer all questions.

15

[Konning]: What if I don't answer his question?

The Court: Then tell him to -- ask him to repeat it or say you don't understand. Don't make up an answer.

[Konning]: I don't understand.

[Prosecutor]: Why did you say that you're operating under sudden passion if you don't know what it is?

[Konning]: You asked me a question. I told you yes, and then I don't understand the second part of it.

[Prosecutor]: Okay. All right. What passion were you operating under when you killed Lizeth?

[Konning]: Can you give me examples?

[Prosecutor]: I didn't kill Liz. I need you to tell me what you were feeling at the time.

[Konning]: I don't know how to answer that because I don't understand what answer you're looking for.

[Prosecutor]: What emotion were you feeling when you killed Liz?

[Konning]: Desperate, separate emotion.

[Prosecutor]: Desperate, sep --

[Konning]: Depressed.

[Prosecutor]: Depressed.
        What did she do to provoke this passion to you?

[Konning]: The gun.

Konning agreed that Carpio pulled a gun, and he agreed his response was to "bull-rush" her. As the Exhibit 8 video was played, Konning agreed that at one point,

16

Carpio was behind the open door of her vehicle, her hands were down by the door, and the vehicle's door was between Konning and Carpio. Konning agreed that, after the shooting, he dropped the gun and took off running.

According to Konning, the night before the shooting, he received a video of Carpio "sleeping with another guy[,]" and he went to the house to turn the power off. Konning also testified that he assumed the cameras went off when the lights went off. He testified that he did not want the jury to hear about that because he did not want to expose the problems they were having and his belief that Carpio was cheating on him.

Konning agreed that at some point he had slapped Carpio's face, hit her head on the wall by pushing her, rammed his car into hers, and choked her. He denied strangling her, pulling her hair, and threatening to hit her with a phone.

During Konning's testimony on cross-examination, audio recordings of certain phone calls Konning made while in jail were published to the jury:

- a call with his sister in which his sister says that he should take responsibility, and Konning responds that he is not admitting to anything;
- a call with his sister in which she tells him he should show some emotion, that it is all on camera, and he should admit to it if it is true. Konning tells his sister he has a girlfriend, that he is innocent, and he needs a lawyer, and that when he found out it was his wife who was shot, he cried;
- a call with his uncle in which Konning states that the case went from serious to being a joke and "every time I think of it, I laugh";
- a call with his aunt and uncle in which Konning states that his sister is the reason he was arrested and that she had signed a statement

17

against him. His aunt says Konning did nothing wrong and it was Konning's sister who shot Carpio, to which Konning replies, "I know." His aunt offers to write a statement for him saying Konning was cooking cabbage for her;

- a call with his mother in which she repeatedly asks Konning whether he did it, and Konning says he did not, that "this is not my character." In court, Konning is questioned about this statement and he agreed that "[p]art of that is a lie";

- a call with his aunt in which Konning tells her that the judge is out to get him. When questioned about this in court, Konning testified that he did not want to tell his aunt that he was scared to go in front of the judge;

- a call with his uncle in which Konning says they got a video from Carpio's phone and "it's not pretty";

- a call with his sister in which his sister says he should say that Carpio shot at him before and this time was at closer range, that it was a "crime of passion" because "everybody knows the girl was cheating on you";

- a call with his aunt and uncle in which Konning mentions the video and says "it ain't a pretty sight";

- a call with his sister in which Konning asks her to look up the punishment for involuntary manslaughter; and

- a call with his uncle in which Konning says that his lawyer was going to try to get the charge reduced to a second-degree felony, that would get Konning seven years, and that Konning would be out in three-and-a-half years.

Issues

In five issues, Appellant argues that the evidence was legally and factually insufficient to support the jury's negative finding on his sudden-passion defense. Appellant argues that the verdict of the jury is contrary to the law and the evidence (Issue One), that the jury's verdict on sudden passion was against the great weight and preponderance of the evidence (Issue Two), that the jury's adverse finding is

18

legally insufficient (Issue Three) and factually insufficient (Issue Four), and that no rational juror could have found that Appellant did not act under the influence of sudden passion (Issue Five).

Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 865 (Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)). The appellate

court does not reweigh the evidence or determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13).

Although *Brooks* abolished factual sufficiency review as it applies to criminal convictions, affirmative defenses or affirmative mitigating issues may be evaluated for both legal and factual sufficiency. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). In a legal sufficiency review of an affirmative defense, we first assay the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not do so. *Id*. (citing *See Matlock v. State*, 392 S.W.3d 662, 669-70 (Tex. Crim. App. 2013). "The finding of the factfinder rejecting a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and 'no reasonable [factfinder] was free to think otherwise.'" *Id*. at 20.

In a factual-sufficiency review of a finding rejecting an affirmative defense, and unlike in a legal sufficiency review, we examine the evidence in a neutral light. *Id*. A finding rejecting a defendant's affirmative defense cannot be overruled unless,

"after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id*. Evidence may be legally sufficient to support a jury's determination on a defendant's affirmative defense, yet also may be factually insufficient. *Petetan v. State*, 622 S.W.3d 321, 357 (Tex. Crim. App. 2021).

A person commits murder if he (1) "intentionally or knowingly causes the death of an individual[,]" or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b). Normally, convictions for murder are punishable as first-degree felonies. *Id.* § 19.02(c). Sudden passion is a mitigating circumstance relevant to determining punishment, and if the factfinder returns a verdict in the defendant's favor on his claim of sudden passion, the favorable finding reduces the punishment on the conviction for murder from a felony of the first-degree to a second-degree felony. *Id.* § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 289 (Tex. Crim. App. 2015).

The defendant must prove that he acted under sudden passion by a preponderance of the evidence. Tex. Penal Code Ann. § 19.02(d). To prevail on the defense at trial, the defendant must obtain an affirmative finding that "he caused the death under the immediate influence of sudden passion arising from an adequate

21

cause." *Id.* The Texas Penal Code defines "[a]dequate cause" as a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). "Sudden passion" is defined as a "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2); *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

Analysis

We first note that Appellant's brief does not identify a specific "sudden passion" that induced him to murder Carpio. Instead, he argues that "[s]imple logic would dictate that there is no reason to take flowers to the intended victim of a murder[,]" and that "he reacted in sudden passion to the introduction of the gun by the deceased into the situation." According to Appellant "no rational juror could have concluded that he was not acting under sudden and extreme passion in the commission of the offense." Appellant argues that when he went to Carpio's house on the day of the shooting, he did not anticipate that he would be confronted with a firearm that threatened his life[3] and destroyed his hopes of restoring his marriage.

---

[3] Appellant did not argue at trial, nor does he argue on appeal, that he acted in self-defense.

To prevail on a defense of sudden passion, there must be evidence of (1) an adequate cause (2) that would produce "a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *See* Tex. Penal Code Ann. § 19.02(a)(1). Konning did not testify that he experienced "anger, rage, resentment, or terror" that rendered him incapable of cool reflection. *See id.*

Konning testified that he knew Carpio had a gun, she had pulled the gun on him previously. Sergeant Borrero testified that the video from Carpio's security cameras show that, upon arriving at the McFaddin house and seeing Carpio in the driveway, Konning "bull-rushed" her. Konning testified that he "knew" Carpio had a gun because "[w]hy would you have your hand behind your back?" Konning admitted that he shot Carpio because he realized she hated him, and she wanted him dead. Konning also admitted that he went to Carpio's home the day of the shooting despite a protective order against him, and even though she had refused to answer his calls. A crime scene technician testified that Carpio was found with her car keys still in her hand.

The jury rejected Konning's mitigating affirmative defense. We conclude that the record contains more than a scintilla of evidence that Konning did not act under sudden passion. *Butcher*, 454 S.W.3d at 20. Further, to prevail on his legal sufficiency challenge, Konning had to establish that the evidence conclusively

23

proved his affirmative defense such that "'no reasonable [jury] was free to think otherwise.'" *Id*. He failed to do so.

The jury, as the sole judge of the weight and credibility of the evidence, could have decided that Konning's behavior both before, during, and after the shooting did not demonstrate that Konning had acted under "sudden passion." Konning did not call 911 or otherwise seek assistance after the shooting, but rather he went to his sister's house to drop off her car keys and then he went to his aunt and uncle's house. In some of the recorded jailhouse phone calls, Konning is heard saying he did not shoot Carpio. Konning admitted that he lied to his mother several times when she asked him if he shot Carpio. The jury could have concluded that, in some of the recorded calls, Konning appeared to have been willing for his sister or mother to take the blame for Carpio's death. Konning also agreed that, the day before the shooting, he turned off the electrical service to Carpio's home where Carpio lived on McFaddin, and he stated he thought that would disable the security cameras as well. He also testified that he did not think the jury was going to hear about that. The day before the shooting, Carpio told a caseworker that Konning had threatened to kill Carpio, Konning had turned the breaker off at Carpio's home so that her security cameras were not working, the police came to her house and turned the breaker back on, and the day the shooting occurred, Carpio found her tires had been slashed.

The jury also heard evidence that Konning's relationship with Carpio had often been violent. During his testimony, Konning admitted to slapping Carpio's face, hitting her head on the wall by pushing her, ramming his car into hers, and choking her. He admitted that he and Carpio fought verbally early in their relationship, and at some point, their fights started getting physical. The caseworker testified that Carpio wrote on her application for a protective order that Konning had pushed her, grabbed her hair, slapped her, punched her, strangled her, threatened her with a weapon, hit her head against a wall, and used a car as a weapon. Carpio's friend Candy testified that Carpio told her she felt harassed, threatened, and afraid for her life for about two weeks, and while Carpio was on the phone with Candy on the day of the shooting, Carpio told Candy to call the police because Konning had arrived. A caseworker at the Victims' Assistance Center testified that in an application for a protective order, Carpio alleged that Konning had threatened to kill Carpio, and she was afraid for her life. A copy of Carpio's application for the protective order was found in her vehicle. Multiple police officers testified about a "rolling disturbance" incident in August 2020 in which Konning was running into Carpio's vehicle. Officers also testified about an incident earlier in August 2020 when Carpio called for police assistance because Konning was trying to break the windows of her house.

25

Video from the security cameras at Carpio's home was published to the jury that shows the shooting. The video is about one-and-a-half minutes long, and it shows Carpio standing by her vehicle with the driver's door open when Konning arrives. Officers testified that Carpio's vehicle was still running when police arrived at the scene. We conclude the evidence was legally sufficient for the jury to reject Konning's affirmative defense. *Butcher*, 454 S.W.3d at 20.

In addition, we hold the evidence in the record was also factually sufficient to support the jury's verdict and rejecting Konning's affirmative defense. As stated above, the evidence showed Konning had made previous threats and engaged in violent behavior toward Carpio, he shut off her electricity the night before the incident, and he admitted he thought he had disabled her security cameras. After having viewed the video from the security camera showing Konning rush toward Carpio, along with the testimony and other evidence, as sole judges of the weight and credibility of the evidence, the jurors could have reasonably concluded the evidence does not support Konning's argument claiming that his passion arose from an *adequate cause*. *See* Tex. Penal Code Ann. § 19.02(a)(2). For instance, as the finders of fact, the jurors had the right to reject Konning's testimony to the effect that he went to Carpio's house to give her flowers to show her he was still in love with her. *See Metcalf*, 597 S.W.3d at 865.

26

In this case there was ample evidence from which a reasonable jury could have concluded Konning did not meet his burden of proof on his affirmative defense. *See Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 669-70. We conclude based on the record that the jury's rejection of Konning's sudden-passion defense is not manifestly unjust, shocking to the conscience, or clearly biased, and the evidence is factually sufficient to support the verdict. Because we have concluded the evidence is both legally and factually sufficient to support the jury's rejection of Konning's affirmative defense, we overrule Konning's issues on appeal, and we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on April 10, 2023
Opinion Delivered July 26, 2023
Do Not Publish

Before Horton, Johnson and Wright, JJ.